UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

RACHAEL O'SULLIVAN,

        Plaintiff,

                                              Case Number 11-11832

v.                                          Honorable David M. Lawson

SIEMENS INDUSTRY, INC. and
MICHAEL MERRITT,

        Defendants.

_____/

## OPINION AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Plaintiff Rachael O'Sullivan sold service contracts for fire suppression systems for defendant Siemens Industry, Inc. in part of its Michigan territory. She took a medical leave for the birth of her second child, but when she was about to return, she learned that her supervisor, defendant Michael Merritt, changed her area of responsibility to a territory that had less sales potential than the one she covered before she left on leave. O'Sullivan did not return to work. Instead, she filed a complaint in state court alleging that she was constructively discharged and that the defendants interfered with her right to take maternity leave and retaliated against her in violation of the Family and Medical Leave Act, and discriminated against her on account of her gender and pregnancy in violation of Michigan law. The defendants removed the case to this Court, and after a period of discovery they filed a motion for summary judgment. The Court heard oral argument on September 6, 2012. The Court now concludes that the plaintiff has not identified evidence from which a jury could conclude that she was constructively discharged. Instead, the facts show that she voluntarily chose not to return to work. Therefore, she cannot recover on her FMLA interference claim. Moreover, even if the decision to change the plaintiff's assigned territory may have amounted to the failure to restore

he to an equivalent position had she returned to work, it did not constitute an adverse action by her employer as a matter of law, and therefore she cannot recover under her discrimination and retaliation claims. The Court will therefore grant the defendants' motion for summary judgment.

I.

O'Sullivan is a former sales representative for Siemens Industry's Great Lakes Area Fire Service Team, which is part of the Fire Service Group. As a member of the Fire Service Team, O'Sullivan sold contracts for servicing fire-alarm and fire suppression systems. The contracts called for Siemens to inspect, test, and maintain the fire-alarm and suppression systems in buildings owned by Siemens's customers. The Great Lakes Area team covered all of Michigan and parts of northern Ohio as its sales territory.

O'Sullivan worked as a sales representative from 2000 through 2010. When she started, her sales manager, Kurt Schoonover, assigned her a territory that included Michigan's "Thumb" region plus Oakland and Macomb counties. In 2002, Siemens hired Leslie Donnelly as a sales representative. Schoonover then assigned to Donnelly all of O'Sullivan's original territory except Oakland County, and assigned O'Sullivan Washtenaw, Livingston, and Oakland counties. According to O'Sullivan, Oakland County was the county with the highest sales potential and return; it had the most buildings and fire systems. She believed that the rest of her territory was too spread out; it took her up to four hours a day to drive through it. Schoonover wanted O'Sullivan to focus on Oakland County.

Defendant Michael Merritt became O'Sullivan's manager in 2008, when he was hired by Siemens to supervise the Great Lakes Area Fire Service Team. At the time Merritt took over, the Fire Sales Team consisted of five salespeople: O'Sullivan, Donnelly, John Battles, Lisa Rollstin, and

Paul Allison. Merritt made several changes to the team members' sales territories over the years: first in 2008 when Battles was terminated; again in 2008 when he transferred Livingston County to Donnelly, leaving O'Sullivan with Washtenaw and Oakland counties; and again in January 2010, when Donnelly was terminated due to performance issues, and Merritt asked O'Sullivan and Allison to pick up parts of her territory until a new salesperson was hired.

In July or August 2009 Leslie Donnelly went on an approved FMLA leave. According to O'Sullivan, Merritt was angry while Donnelly was on leave because he had to cover Donnelly's job, and he asked O'Sullivan to help him cover her duties several times. Merritt also complained to Donnelly that he felt overburdened because of her leave, and he told Donnelly "that it must be nice to take a medical leave, but the next person on his Team that went out on a leave of absence would not be a happy camper and would have to face the consequences." Pl.'s Resp. to Mot. for Summ. J., Ex. 3, Donnelly aff. at 4.

Siemens's fiscal year ended September 30th. For fiscal year 2008, O'Sullivan's quota for sales on new fire service contracts was $250,000, which she missed by 43%. She realized $110,594 in "gross margin dollars" (profit) on her sales, which was only 69.1% of Siemens's "national standard" of $160,000 for a salesperson with her years of service. For FY2009, O'Sullivan missed her quota of $300,000 by 64% and achieved only 23.6% the national standard for gross margin. In the first seven months of FY2010, O'Sullivan booked only 27% of her $300,000 quota and 23.6% of her target margin.

For FY2008, Lisa Rollstin had a quota of $275,000, which she exceeded by 0.4%, and she achieved 167% of the national standard for gross margin dollars on her sales. For FY2009, Rollstin beat her $300,000 quota by 32.5% and achieved 231.2% of her target margin.

-3-

By April 2010, the Great Lakes Area Fire Service Team had only three sales representatives — Allison, O'Sullivan, and Rollstin — because Donnelly's departure had left the team short-handed. On April 13, 2010, O'Sullivan gave birth to her second child and started her maternity leave. On April 30, 2010, while O'Sullivan was on still leave, Merritt told her that as part of a general realignment of sales territories, he was assigning Oakland County to Lisa Rollstin. After the realignment, O'Sullivan was assigned the same territory that had been assigned to Leslie Donnelly for six years until she was terminated. Merritt justified the changes as an attempt to "shake things up" and give the team a chance to try new ideas and territories, and as a necessary step to create a territory for Donnelly's replacement, Tom Kidder, who transferred in April to a position as a sales representative with the team.

O'Sullivan told Merritt that she was upset about losing a territory that she had spent ten years cultivating, that she would be losing substantial income as a result of the changes, and that she felt that she was being set up to fail. O'Sullivan asked if the change was temporary, and Merritt told her, "No. This is permanent. I've made the decision and this is done." Def.'s Mot. for Summ. J., Ex. 30, O'Sullivan dep. at 99. O'Sullivan asked Merritt why he was giving her "this terrible territory that Leslie [Donnelly] had for five years that I told you before that I thought was a terrible territory," and Merritt told her that "[I]f anybody can turn this territory around it's you." *Id.* at 158.

On June 10, 2010, O'Sullivan emailed Merritt and stated that "[b]efore [she] decide[s] whether or not [she] will accept this new territory and continue to work for Siemens," she wanted to know what compensation Siemens planned to offer for her loss of commissions and how much Siemens planned to lower her quota. On June 11, 2010, Great Lakes Area Sales Manager Robert Thear (Merritt's boss) told O'Sullivan that Thear and Merritt would meet with her after she returned

-4-

to work to discuss concerns about her new territory. O'Sullivan's FMLA leave ended on July 6, 2010. On July 12, 2010, Merritt called O'Sullivan, told her she had been due back on July 6th, and asked her when she planned to come back to work. O'Sullivan told him that she thought she was supposed to meet with Merritt and Thear before she returned. According to O'Sullivan, she never received notice of her exact return date and assumed it was July 13 ("three months" after her leave started).

O'Sullivan asked if Merritt could schedule a meeting for the week of July 19, 2010, because she needed a week's notice to arrange day care. O'Sullivan admitted that as of July 12, 2010, nobody at Siemens had told her she was terminated. However, on July 16, 2010, O'Sullivan's attorney sent a letter to Alice Gomezese in the Siemens Human Resources department stating that he and his firm had been retained to pursue "various claims stemming from [O'Sullivan's] employment with and termination from Siemens." Siemens regarded O'Sullivan as going on "unapproved personal leave" starting July 6, 2010 and terminated her employment on July 29, 2010, considering her as having resigned.

O'Sullivan charges that Merritt took away her prime sales territory — Oakland County — to retaliate against her for taking the leave she was entitled to under the FMLA, because he resented having to do her job while she was on leave. Siemens and Merritt cast O'Sullivan as a poorly performing salesperson who decided to resign her position voluntarily rather than return from her approved FMLA leave, because she was unhappy with the April 2010 change in her sales territory.

The evidence suggests that the Great Lakes Area sales team considered Oakland County a plum territory. Merritt admitted that he knew Oakland County comprised "a large percentage" of O'Sullivan's business, that he believed removing Oakland County was a significant change to her

-5-

territory, and that removing it would impact O'Sullivan financially.  Merritt also conceded that, based on his experience in sales, if asked to name the counties in Michigan he would most want to have in his territory, he would rank Wayne County first and Oakland County second.  Lisa Rollstin testified that the territory assigned to O'Sullivan after April 30, 2010 was not equal to the territory that O'Sullivan had prior to her leave, because it had fewer customers, required more driving time to service, and would have produced lower margin sales due to the hard economic conditions in rural Michigan.  Lisa Donnelly testified that, based on her first-hand experience working the territory assigned to O'Sullivan after April 30, 2010, O'Sullivan would have suffered a substantial drop in commission income due to the lack of sales opportunities in the new territory.

Donnelly testified that commissions made up a substantial part of total income for the Fire Service Team sales representatives, often exceeding their base pay.  However, no one, including the plaintiff, testified to any specific amounts or percentages of income that came from commissions.  O'Sullivan conceded that she could not say exactly how much of her income came from commissions as of April 2010, but she testified that her commission rate on new sales was 12% of the margin dollars realized on those sales.  Thear testified that O'Sullivan realized margin dollars of $110,594 on her new sales in FY2008, suggesting that she earned approximately $13,271 in new sales commissions.  For FY2009, the corresponding figures are $37,762 in margin ($4,531 commission); and for FY2010 $48,969 in margin ($5,876 commission).  O'Sullivan estimated that half of her commission income came from renewals of existing contracts, which she received in addition to her commissions on new sales, from which it might be inferred that she received between $9,000 and $26,000 in commissions each year for fiscal years 2008, 2009, and 2010.

O'Sullivan admitted that she was never told by anyone at Siemens that she would always have Oakland County as her main sales territory, but she insists that she always was consulted by sales managers on prior territory changes, and that she never had been forced to accept an earlier change if she objected. However, O'Sullivan understood that the ultimate discretion of deciding which territory went to which salesperson rested with the sales manager, and she was never offered any guarantee that she would always have a particular territory.

On April 1, 2011, O'Sullivan filed a four count complaint in Wayne County, Michigan circuit court alleging gender and pregnancy discrimination and retaliation in violation of Title VII (count 1); violation of the Family and Medical Leave Act (count 2); gender and pregnancy discrimination in violation of the Michigan Elliot-Larsen Civil Rights Act (count 3); and violation of the Michigan Bullard-Plawecki Right to Know Act, Mich Compiled Laws §§ 423.501, *et seq.* (count 4). The parties have stipulated to dismiss counts 1 and 4. The defendants challenge counts 2 and 3 in their motion for summary judgment.

II.

It is well settled that summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The party bringing the summary judgment motion has the initial burden of informing the district court of the basis for its motion and identifying portions of the record that demonstrate the absence of a genuine dispute over material facts." *Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009) (citing *Mt. Lebanon Personal Care Home, Inc. v. Hoover Universal, Inc.*, 276 F.3d 845, 848 (6th Cir. 2002)). "Once that occurs, the party opposing the motion then may not 'rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact'

-7-

. . . ." *Ibid.* (quoting *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989)).  Instead, the party opposing a motion for summary judgment must designate specific facts in affidavits, depositions, or other factual material showing "evidence on which the jury could reasonably find for the plaintiff."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).  If the non-moving party, after sufficient opportunity for discovery, is unable to meet his or her burden of proof, summary judgment is clearly proper. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).  "Thus, the mere existence of a scintilla of evidence in support of the [opposing party]'s position will be insufficient; there must be evidence on which the jury could reasonably find for the [opposing party]." *Highland Capital, Inc. v. Franklin Nat'l Bank*, 350 F.3d 558, 564 (6th Cir. 2003) (quoting *Anderson*, 477 U.S. at 251-52) (internal quotation marks omitted).

## A.  FMLA claims

"The FMLA makes it unlawful for an employer to 'interfere with, restrain, or deny the exercise of' certain rights created by the statute." *Pharakhone v. Nissan North America, Inc.*, 324 F.3d 405, 407 (6th Cir. 2003) (quoting 29 U.S.C. § 2615(a)(1)). "Among these statutory rights is that of an eligible employee to take up to 12 weeks of leave '[b]ecause of the birth of a son or daughter of the employee and in order to care for such son or daughter.' " *Ibid.*  The Sixth Circuit has explained that the FMLA provides two possible theories of recovery for qualifying employees: "the 'interference' or 'entitlement' theory, under which employers may not 'interfere with, restrain, or deny the exercise of or the attempt to exercise' FMLA rights, 29 U.S.C. § 2615(a)(1); and the 'retaliation' or 'discrimination' theory, under which employers may not 'discharge or in any other manner discriminate against any individual for opposing any practice made unlawful' by the FMLA, § 2615(a)(2)." *Branham v. Gannett Satellite Information Network, Inc.*, 619 F.3d 563, 568 (6th. Cir.

2010).  "Employers who violate [the FMLA] are 'liable to any eligible employee affected' for damages and 'for such equitable relief as may be appropriate.' " *Cavin v. Honda of America Mfg., Inc.*, 346 F.3d 713, 719 (6th Cir. 2003) (quoting 29 U.S.C. § 2617(a)(1)).  The plaintiff in this case has advanced both theories against the defendants.

### 1.  Interference claim

To establish a *prima facie* case of FMLA interference, the plaintiff must show that (1) she was an eligible employee; (2) the defendant was an employer as defined under the FMLA; (3) the employee was entitled to leave under the FMLA; (4) the employee gave the employer notice of her intention to take leave; and (5) the employer denied the employee FMLA benefits to which she was entitled. *Donald v. Sybra, Inc.*, 667 F.3d 757, 761 (6th Cir. 2012).  There is not much dispute here over the first four elements.  However, the defendants contend that O'Sullivan has not offered evidence on the fifth element because O'Sullivan had no right to a particular territory, and she never actually returned to work.  O'Sullivan counters that taking Oakland County from her as an assigned territory was such an odious penalty that she was constructively discharged and therefore never restored to her pre-leave position.

It is well settled that "[a]n employee who has taken FMLA leave [has the right] 'to be restored by the employer to the position of employment held by the employee when the leave commenced.' " *Pharakone*, 324 F.3d at 407 (quoting 29 U.S.C. §§ 2612(a)(1)(A), 2614(a)(1)(A)). Certainly, an employee who is fired after taking FMLA leave has not been restored to her prior position.  However, there is no evidence that Siemans fired O'Sullivan, and she has not offered evidence that the working conditions to which she would have returned were so awful as to constitute a constructive discharge.

-9-

To demonstrate constructive discharge, a plaintiff must show that (1) the employer deliberately created intolerable working conditions, as perceived by a reasonable person, (2) the employer did so with the intention of forcing the employee to quit, and (3) the employee actually quit. *Savage v. Gee*, 665 F.3d 732, 739 (6th Cir. 2012). "Reassignments without changes in salary, benefits, title, or work hours usually do not constitute adverse employment actions." *Policastro v. Northwest Airlines, Inc.*, 297 F.3d 535, 539 (6th Cir. 2002). For a transfer or reassignment to amount to a constructive discharge, its conditions must be objectively intolerable to a reasonable person. *Ibid.*

In determining whether an employer deliberately created intolerable working conditions, courts must consider both the employer's intent and the feelings of an objectively reasonable employee about the conditions. *Ibid.* The inquiry generally is case-specific, *Saroli v. Automation & Modular Components, Inc.*, 405 F.3d 446, 451 (6th Cir. 2005), but the Sixth Circuit has identified several factors that inform the conclusion, including whether the employee suffered "(1) demotion; (2) reduction in salary; (3) reduction in job responsibilities; (4) reassignment to menial or degrading work; (5) reassignment to work under a male supervisor; (6) badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation; or (7) offers of early retirement or continued employment on terms less favorable than the employee's former status." *Ibid.* (internal quotation marks and alterations omitted).

There is no evidence in this record that the proposed change in O'Sullivan's sales territory created an intolerable working condition. The change in territory impacted none of the factors listed above, except, perhaps, a potential reduction in overall compensation (her base salary remained the same). However, regardless of her projected income loss, O'Sullivan herself presented evidence that

-10-

at least two of her peers on the Fire Service Team did not find their jobs objectively intolerable when assigned to work the same territory with which O'Sullivan claims she was "burdened." Leslie Donnelly testified that she worked the same territory for six years prior to her termination. Anthony Younans, who accepted a new job as a Siemens sales representative to replace O'Sullivan, does not indicate anywhere in his testimony that he found his new job intolerable or that he felt compelled to resign as a result of the territory he was assigned.

Moreover, the defendants presented unrefuted evidence of sales performance for members of the Fire Service Team for fiscal years 2006 through 2010 showing that other team members did quite well in that territory: for FY2008, Donnelly booked $236, 597 in gross sales — 96% of the $245,931 in gross sales recorded by O'Sullivan; in FY2009, Donnelly did even better, booking $319,443 in gross sales to O'Sullivan's $123,581 (more than 2–1/2 times as much); and Donnelly outperformed O'Sullivan on her sales margins both years — meeting 73.9% of the national standard in FY2008 (to O'Sullivan's 69.1%) and 93.5% in FY2009 (to O'Sullivan's 23.6%). Donnelly managed to post those numbers while working the exact territory that O'Sullivan claims would have been objectively intolerable for her to shoulder upon her return from leave, and while O'Sullivan had the benefit of her "far more lucrative" territory including Oakland County.

And O'Sullivan has another problem proving that the territory change effectuated an intolerable condition: she never gave it a try. The Sixth Circuit has held that "[a]n employee who quits a job in apprehension that conditions may deteriorate later is not constructively discharged. Instead, the employee is obliged 'not to assume the worst, and not to jump to conclusions too fast.'" *Agnew v. BASF Corp.*, 286 F.3d 307, 310 (6th. Cir. 2002) (quoting *Garner v. Wal-Mart Stores, Inc.*, 807 F.2d 1536, 1539 (11th Cir.1987)). Because O'Sullivan did not return to work at the end of her

leave, she has no evidence to refute the clear record of two other sales representatives doing relatively well in that same territory, with at least one outpacing O'Sullivan's own results in a supposedly more profitable region.

However, O'Sullivan need not prove constructive discharge to establish her interference claim. She need only show that she was not restored to an equivalent position. Reinstatement must be either to the same position the employee held when she went on leave or to an "equivalent position" having "equivalent employment benefits, pay, and terms and conditions of employment." 29 U.S.C. § 2614(a). "The employee must have the same or an equivalent opportunity for bonuses, profit-sharing, and other similar discretionary and non-discretionary payments." 29 CFR § 825.215(e)(3). As the Sixth Circuit has noted:

> An "equivalent position" under 29 U.S.C. § 2614(a)(1)(B) is: [O]ne that is virtually identical to the employee's former position in terms of pay, benefits and working conditions, including privileges, perquisites and status. It must involve the same or substantially similar duties and responsibilities, which must entail substantially equivalent skill, effort, responsibility, and authority.

*Grace v. USCAR*, 521 F.3d 655, 669 n.13 (6th Cir. 2008).

With the evidence of the relatively lucrative potential for an assignment of Oakland County as part of the sales territory, there is evidence from which a jury could infer that the post-leave assignment was not equivalent under the FMLA. In *McArdle v. Dell Prods., L.P.*, 293 F. App'x 331 (5th Cir. 2008), for instance, the Fifth Circuit held that a sales representative was denied his right to reinstatement where a single lucrative and desirable account was reassigned to another salesperson during his FMLA leave, and where he subsequently was assigned several less profitable "problem accounts" that were judged hard to service. The change led to an immediate loss of

-12-

$12,000 to $20,000 in commission income, a steady decline in the plaintiff's sales record, and his eventual termination for poor performance. *McArdle*, 293 F. App'x at 334–36.

But O'Sullivan faces yet another obstacle: the right to reinstatement arises only upon the employee's return to work: "If an employee returning from FMLA leave can perform the essential functions of his previous or an equivalent position, the right to restoration is triggered on the employee's timely return from leave." *Hoge v. Honda of America Mfg. Inc.*, 384 F.3d 238, 247 (6th Cir. 2004) (citing 29 U.S.C. § 2614(a); 29 C.F.R. § 825.214(b)). Because O'Sullivan voluntarily quit, she never "triggered" the right to be restored to an equivalent position. Moreover, the FMLA right to reinstatement is limited and protects only those terms and conditions of employment that an employee would have had the right to retain if she had not taken leave:

> [T]he substantive right is not absolute because the right established "shall [not] be construed to entitle any restored employee to . . . any right, benefit, or position of employment other than any right, benefit, or position to which the employee would have been entitled had the employee not taken the leave." 29 U.S.C. § 2614(a)(3)(B); 29 C.F.R. § 825.216(a) ("An employee has no greater right to reinstatement or to other benefits and conditions of employment than if the employee had been continuously employed during the FMLA leave period.").

*Hoge*, 384 F.3d at 245. O'Sullivan has not argued — nor could she on the present record — that if she had never taken leave in April 2010 she would have had the right to retain Oakland County as part of her sales territory for as long as she worked for Siemens and did not consent to give it up. She admitted as much in her testimony, when she acknowledged that the sales manager had the ultimate discretion to assign territories. And if she did not have a right to retain Oakland County while not on leave, then finding that she had the right to retain it while on leave would do what the FMLA expressly disclaims: grant her a statutory right to return to a particular pre-leave status quo,

-13-

when she would have had no right to object if Siemens had made the same change, at the same time, but while she was working for twelve weeks rather than taking her approved leave.

The Court finds, therefore, that O'Sullivan has not brought forth evidence that creates a material fact question on all the elements of her FMLA interference claim. That claim must be dismissed.

### 2. FMLA retaliation claim

To establish a *prima facie* case of FMLA retaliation, the plaintiff must show that: (1) she was engaged in an activity protected by the FMLA; (2) the employer knew that she was exercising her rights under the FMLA; (3) after learning of the employee's exercise of FMLA rights, the employer took an employment action adverse to her; and (4) there was a causal connection between the protected FMLA activity and the adverse employment action. *Sybra*, 667 F.3d at 761.

To determine what qualifies as an adverse action in employment-related retaliation claims, the Sixth Circuit applies the Title VII retaliation standard announced in *Burlington Northern & Santa Fe Railway Company v. White*, 548 U.S. 53 (2006). *See Jordan v. City of Cleveland*, 464 F.3d 584, 594 (6th Cir. 2006). The test employs an objective component. "[A] plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which . . . means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington*, 548 U.S. at 68 (internal quotation marks omitted). The Second Circuit has adapted the formulation to FMLA cases thusly: "For purposes of the FMLA's anti-retaliation provision, a materially adverse action is any action by the employer that is likely to dissuade a reasonable worker in the plaintiff's position from exercising [her] legal rights." *Millea v. Metro–North R.R. Co.*, 658 F.3d 154, 164 (2d Cir. 2011).

-14-

The change in sales territory in this case cannot be said to amount to a penalty. There is no proof that the plaintiff's earnings were reduced or that her working conditions would have been more burdensome. The territory to which she would have been reassigned was not "prime," but based on the performance of other employees, it was capable of allowing the plaintiff to generate income that was roughly the same as what she earned before her leave. "An adverse employment action is an action by the employer that constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 402 (6th Cir. 2008) (internal quotation marks omitted). There is no evidence that any of that occurred here. Although the plaintiff may make out a case that the new territory was not "equivalent" for the purpose of her FMLA interference claim, it does not necessarily follow that the reallocation of territories was "adverse action" for the purpose of showing retaliation. *See Hunt v. Rapides Healthcare System, LLC*, 277 F.3d 757, 770 (5th Cir. 2001) (holding that reassignment of the plaintiff from the day shift to the night shift after taking FMLA leave amounted to the failure to restore her to an equivalent position, but was not adverse action because the change was not a demotion, change in job duties, imposition of discipline, or reduction in pay).

The plaintiff has shown at most that if she returned to work, she would have been reassigned to a sales territory that another, former sales person had covered in the past. Her base salary remained the same, her commission structure remained as it was before her FMLA leave, her duties were the same, and her title was the same. The Court finds that the reassignment was not likely to dissuade a reasonable worker in the plaintiff's position from taking FMLA leave.

Because the plaintiff has failed in offering evidence of adverse action by her employer, she cannot prevail on a claim of retaliation under the FMLA.

### B. Gender/pregnancy discrimination claims

The plaintiff also has alleged that the defendants discriminated against her because of her gender and because she was pregnant. The Michigan Elliot-Larson Civil Rights Act (ELCRA) forbids an employer to "discharge, or otherwise discriminate against an individual with respect to employment, compensation, or a term, condition, or privilege of employment, because of religion, race, color, national origin, age, [or] sex," Mich. Comp. Laws § 37.2202(1)(a), or to "[t]reat an individual affected by pregnancy, childbirth, or a related medical condition differently for any employment-related purpose from another individual who is not so affected but similar in ability or inability to work." Mich. Comp. Laws § 37.2202(1)(d).

The plaintiff's discrimination claims are flawed in several respects, but the failure to prove adverse action, as noted above, is dispositive. To establish an ELCRA discrimination claim, the plaintiff must show that (1) she was a member of a protected class, (2) she was subject to an adverse employment action, (3) she was qualified for the position, and (4) others, similarly situated and outside the protected class, were treated differently. *Town v. Mich. Bell Tel. Co.*, 455 Mich. 688, 695, 568 N.W.2d 64 (1997). Proof of adverse employment action is necessary to show employment discrimination under ELCRA. Because the plaintiff has not offered evidence that the defendants took adverse action against her when she took medical leave for her pregnancy, her discrimination claims must fail as a matter of law.

-16-

III.

After viewing the record in the light most favorable to the plaintiff, the Court concludes that the plaintiff has failed to show that she was constructively discharged, and because she did not return to work she did not trigger her right to reinstatement under the FMLA.  Therefore, the plaintiff's FMLA interference claim fails as a matter of law.  And because the plaintiff has not offered evidence of adverse action by her employer, her FMLA, gender, and pregnancy discrimination claims fail as well.

Accordingly, it is **ORDERED** that the defendants' motion for summary judgment [dkt. #26] is **GRANTED**.

It is further **ORDERED** that the defendants' motion in limine [dkt. #39] is **DISMISSED as moot**.

It is further **ORDERED** that the complaint is **DISMISSED WITH PREJUDICE**.

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Dated:   September 24, 2012

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on September 24, 2012.

s/Deborah R. Tofil
DEBORAH R. TOFIL